# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

THERESA BRADFORD,       )
                             )
           Plaintiff,      )
                             )
v.                          )   Docket No. 2:21-cv-00015-NT
                             )
NAPLES CAUSEWAY      )
DEVELOPMENT, LLC, et al.,   )
                             )
          Defendants.   )

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before me are a motion for summary judgment by Plaintiff Theresa Bradford (ECF No. 21) and a motion for summary judgment by Defendants Naples Causeway Development, LLC and Richard Dyke (ECF No. 27). For the reasons set forth below, the Plaintiff's motion is GRANTED IN PART and DENIED IN PART, and the Defendants' motion is DENIED.

## FACTUAL BACKGROUND[1]

The White Pines Inn (the "**Inn**") is a motel in Raymond, Maine owned by Defendant Naples Causeway Development, LLC ("**NCD**"). Pl.'s SMF ¶ 1; Defs.' SMF

---

[1] The facts are drawn from: (1) documents in the summary judgment record (ECF Nos. 19–20, 24–26, 29–33, and 35); (2) the Plaintiff's Consolidated Statement of Material Facts ("**Pl.'s SMF**") (ECF No. 46), which is a compilation of the Plaintiff's statement of material facts (ECF No. 22), the Defendants' response and statement of additional material facts (ECF No. 39), the Plaintiff's reply statement of material facts (ECF No. 41), and the Defendants' response to the Plaintiff's requests to strike the Defendants' statement of additional material facts (ECF No. 46); and (3) the Defendants' Consolidated Statement of Material Facts ("**Defs.' SMF**") (ECF No. 45), which is a compilation of the Defendants' statement of material facts (ECF No. 28), the Plaintiff's response and statement of additional material facts (ECF No. 38), the Defendants' reply statement of material facts (ECF No. 43), and the Plaintiff's response to the Defendants' requests to strike the Plaintiff's statement of additional material facts (ECF No. 45).

¶¶ 1, 3. Defendant Richard Dyke is NCD's sole member. Defs.' SMF ¶¶ 1–2. The Inn property consists of a two-story house with a one-story wing on each side of the house, containing eleven rental units. Defs.' SMF ¶ 4. The Inn's office is located on the first floor of the house, which also includes a full kitchen, large living room, three bedrooms, and three bathrooms. Defs.' SMF ¶ 4.

Starting in August of 2013, NCD began operating the Inn by renting the eleven rental units as motel rooms. Defs.' SMF ¶ 5. Jennifer Daruszka was the Inn's first manager from July of 2013 until mid-April of 2016. Defs.' SMF ¶ 7. NCD provided an expense-free, year-round home for Ms. Daruszka and her family in the Inn's two-story house. Defs.' SMF ¶ 5. After Ms. Daruszka resigned in April of 2016, the Plaintiff, Theresa Bradford, took over as manager. Pl.'s SMF ¶ 3; Defs.' SMF ¶ 7. Richard Dyke interviewed and hired Ms. Bradford, and NCD employed Ms. Bradford as manager of the Inn from April 12, 2016 through September 5, 2019. Pl.'s SMF ¶¶ 3, 7; Defs.' SMF ¶¶ 30, 44.

When Ms. Bradford was hired, the Defendants offered to compensate her, and she agreed to be compensated, with a weekly salary of $250 plus an expense-free full-time residence in the two-story house at the center of the Inn building. Defs.' SMF ¶ 33. There was no written agreement about Ms. Bradford's employment arrangement. Pl.'s SMF ¶ 52; Defs.' SMF ¶ 62. Marie Caron, an accountant for NCD, discussed the Inn manager job with Ms. Bradford before she was hired.[2] Defs. SMF ¶ 58. Ms. Caron

---

[2]    Ms. Caron, a certified public accountant with training in human resources, performed accounting and other business services for NCD. Pl.'s SMF ¶ 35; Defs.' SMF ¶ 23. She was in charge of the Inn's payroll entry, Ms. Bradford reported weekly occupancy and sales revenue data to her every week, and Ms. Caron functioned as Ms. Bradford's direct supervisor. Pl.'s SMF ¶¶ 10, 35; Defs.' SMF

maintained handwritten notes that she had taken before and during the discussion, which reflect an offer of "$1,000/month, including residence and utilities." Defs.' SMF ¶ 58; Pl.'s Reply SMF Ex. 3 ("**Caron Notes**") (ECF No. 41-3). After making the initial offer of $250 per week, NCD increased Ms. Bradford's weekly pay to be the equivalent of the then-current minimum wage for forty hours of work each week.[3] Pl.'s SMF ¶¶ 13–16; Defs.' SMF ¶ 34. During her employment, Ms. Bradford's weekly pay was as follows: $274.15 for most of 2016; $360 in 2017; $400 in 2018; and $440 in 2019. Pl.'s SMF ¶¶ 13–16; Defs.' SMF ¶ 34.

While Ms. Bradford served as Inn manager from April of 2016 to September of 2019, she and her husband lived on the Inn property for free, paying no rent, taxes, utilities, or maintenance costs. Pl.'s SMF ¶ 3; Defs.' SMF ¶ 35. Ms. Bradford was told that she would stay at the house to oversee the Inn property and that she and her husband could treat the house as if it were their own home. Defs.' SMF ¶ 69; Pl.'s SMF ¶ 53. NCD placed no restrictions on Ms. Bradford as to the number of people that could live with her, and for about eight months (from late 2018 to early August of 2019), Ms. Bradford's daughter, son-in-law, and two small grandchildren also lived with Ms. Bradford for free in the house at the Inn. Pl.'s SMF ¶ 53; Defs.' SMF ¶¶ 35, 46.

---

¶ 37. Ms. Caron periodically stopped by the White Pines Inn, but the parties disagree about how often these visits occurred. *Compare* Pl.'s SMF ¶ 38 ("Ms. Caron would pop into the Inn 3-4 times per week") *with* Pl.'s SMF ¶ 67 ("Ms. Caron typically stopped by the White Pines Inn one time per week.").

[3]     When she was first hired, Ms. Bradford was categorized as an "exempt" employee, but was soon changed to a non-exempt hourly employee because her position did not qualify as exempt where she was the sole employee and had no one reporting to her. Pl.'s SMF ¶ 9.

During her tenure, Ms. Bradford was NCD's only employee and was the sole person responsible for the management of the Inn. Pl.'s SMF ¶ 6. Before hiring Ms. Bradford, Mr. Dyke and Ms. Caron talked about the Inn manager's job duties, and Ms. Caron discussed them with Ms. Bradford. Defs. SMF ¶ 58; *see* Caron Notes. Ms. Bradford's job duties included: taking reservations, monitoring and responding to emails, and checking guests in and out; cleaning rooms[4] and doing laundry; turning the vacancy sign on at 9:00 in the morning and off at 9:00 at night; being available in person or by phone from 9:00 a.m. to 9:00 p.m. to assist guests; and preparing a weekly occupancy report and receipts for Ms. Caron. Defs.' SMF ¶ 8; Pl.'s SMF ¶ 21. She also ordered all supplies, ran Inn-related errands, and performed light maintenance such as changing lightbulbs, painting, cleaning the game room, watering and weeding flower beds, and shoveling snow. Defs.' SMF ¶ 8; Pl.'s SMF ¶ 21. In spring and fall, Ms. Bradford did a more major cleaning that involved pulling all of the furniture out of the rooms, shampooing carpets, washing walls, and cleaning the bathrooms, dressers, nightstands, refrigerators, microwaves, televisions and stands, chairs, windows, and outside screens. Pl.'s SMF ¶ 22. She also took care of the flower boxes and holiday decorations and attended chamber of commerce events. Pl.'s SMF ¶ 21.

---

[4]     If a room was rented nightly, Ms. Bradford would clean it the next day after the guest had checked out; if it was rented for more than one day, she would make the bed and change towels on request. Pl.'s SMF ¶ 24. If a room was rented weekly, she would clean the room once a week and, upon request, would provide new towels and sheets midweek and make beds. Pl.'s SMF ¶¶ 24–25.

Ms. Bradford was responsible for the Inn during the hours it was open, from 9:00 a.m. to 9:00 p.m. every day. Defs.' SMF ¶ 64. According to the Plaintiff, she worked from 9:00 a.m. to 9:00 p.m. seven days a week year-round, and her job duties consumed all of that working time. Pl.'s SMF ¶ 19; Defs.' SMF ¶ 74. From October of 2018 through April of 2020, a FedEx delivery driver saw Ms. Bradford working every time the driver made deliveries to the Inn between 9:00 a.m. and 6:00 p.m., including on the weekends. Pl.'s SMF ¶ 27. Neither Mr. Dyke nor Ms. Caron ever put a limit on the number of hours Ms. Bradford was supposed to work. Defs.' SMF ¶ 64. The Defendants, however, felt that "common sense as to what it takes to clean and prepare a room for rental" meant that Ms. Bradford's position was far less than forty hours a week. Pl.'s SMF ¶¶ 45–46. According to the Defendants, the agreement with Ms. Bradford was that she would work as much or as little as needed to manage the Inn, get paid a fixed weekly salary, and have a free place to live for herself and her family. Defs.' SMF ¶ 50.

No one kept a record of the hours that Ms. Bradford worked. Pl.'s SMF ¶ 39; Defs.' SMF ¶ 51. The Defendants did not give Ms. Bradford any instruction on how to track her hours. Pl.'s SMF ¶ 41. There was no time clock or time sheet to track her hours, and the Defendants did not ask Ms. Bradford to sign in or out when she was or was not working. Pl.'s SMF ¶¶ 40, 42. Ms. Bradford never reported to Mr. Dyke or Ms. Caron that she worked more than forty hours in any week. Defs.' SMF ¶ 52; Pl.'s SMF ¶ 72. The Defendants did not know how many hours Ms. Bradford worked each week. Pl.'s SMF ¶ 43. Instead, they paid her the same flat-fee salary—the equivalent

of Maine's minimum hourly wage for a forty-hour workweek—regardless of how many hours she worked in a week. Pl.'s SMF ¶¶ 9, 43–44; Defs.' SMF ¶ 34. The greatest variable in how long it took to perform the listed manager duties was the number of rooms turning over, which was far greater in the summer than in the rest of the year. Defs.' SMF ¶ 20. One Monday morning in July, after Ms. Bradford had ten rooms to check out in one day, Ms. Caron emailed Ms. Bradford:

> I see it was another good week! I'm quite sure you were exhausted yesterday! Also please be sure to let me know if you work more than 40 hours per week by Sunday night so that I can enter payroll first thing on Monday mornings.

Pl.'s SMF ¶ 48.

When Ms. Bradford had more Inn work than she could get done on her own in a given day, she enlisted the help of her mother or her daughter and paid them out of her own pocket. Pl.'s SMF ¶ 31. She never told NCD that she had too much work or needed the help; NCD would have reimbursed her if she had told anyone. Pl.'s SMF ¶ 31. Ms. Bradford's husband also helped her every day with tasks for which he did not get paid, like vacuuming and shampooing rugs, deep-cleaning rooms, cleaning the game room, and weed-whacking. Pl.'s SMF ¶ 32. According to the Bradfords, Mr. Bradford told Defendant Dyke that the job took more than forty hours, and Mr. Dyke joked that he got two innkeepers for the price of one. Pl.'s SMF ¶¶ 33, 38. Mr. Dyke denies that Mr. Bradford told him that Ms. Bradford was working more than forty hours a week, and denies he joked to the Bradfords about two-for-one innkeepers. Pl.'s SMF ¶¶ 33, 72.

If Ms. Bradford needed to leave the Inn between the hours of 9:00 a.m. and 9:00 p.m., she had to stay within twenty or thirty minutes of the Inn and leave her cell number on the door so she could be reached. Pl.'s SMF ¶ 20. Under the Inn manager's listed duties in Ms. Caron's notes from her interview with Ms. Bradford, Ms. Caron wrote:

- present at motel during check-in times
  - sometimes note on door, but potential to miss customers
  - 9:00 am light off "no vacancy" – 9:00 pm

Caron Notes. And Mr. Dyke told Ms. Bradford: "[I]f you leave . . . you're not married to that place—you can leave your number on the door. They can call you. Do not go any further than 20 or 30 minutes away so that you can come back if you need to." Defs.' SMF ¶ 44. Ms. Bradford sometimes had to run errands for the Inn, go to a doctor's appointment, or get groceries during Inn hours. Defs.' SMF ¶¶ 45, 48, 73. During the months that Ms. Bradford's daughter's family lived with her, Ms. Bradford sometimes drove her daughter to work thirty minutes away if her daughter's car broke down (which might have been once a week or once every two weeks), and she occasionally watched her grandchildren for thirty-minute periods. Defs.' SMF ¶¶ 47, 71–72. She might also take two breaks during the workday, but she was otherwise in the Inn's office and available. Defs.' SMF ¶ 49; *see* T. Bradford Dep. 96:9-19 (ECF No. 19-1). According to Ms. Bradford, she could never go anywhere because she "was tied to the property." Defs.' SMF ¶ 68. Ms. Bradford missed family functions because obligations to the Inn did not allow her to be away for long enough periods of time to attend, though neither Mr. Dyke nor Ms. Caron realized that Ms.

Bradford believed she had to miss family functions because of the job. Pl.'s SMF ¶¶ 20, 75. They also say that they did not know that Ms. Bradford could not handle all the Inn work without her husband's help. Pl.'s SMF ¶¶ 65–66.

Although Mr. Dyke and Ms. Caron both acknowledged that Ms. Bradford "worked very hard" and "did a good job" at the Inn, Defendant Dyke decided to terminate Plaintiff's employment, effective September 6, 2019. Pl.'s SMF ¶¶ 11, 59. According to Ms. Caron, Mr. Dyke's termination decision was based on a few considerations, including that he was thinking about converting the house into two units and that he thought Ms. Bradford wasn't around a lot of times when he drove by the Inn and didn't see her vehicle so felt that she was missing new customers. Defs.' SMF ¶ 70; *see* M. Caron Dep. 42:25-43:23 (ECF No. 19-4).

## PROCEDURAL BACKGROUND

The Plaintiff filed her Complaint in state court in October of 2020. Compl. (ECF No. 3-4). The Complaint asserts three claims: violation of Maine's unpaid wages statute (Count I), violation of Maine's minimum wage and overtime laws (Count II), and violation of the federal minimum wage and overtime laws (Count III).[5] Compl. 3–5. On January 8, 2021, the Defendants removed the action to this Court and filed their Answer. Notice of Removal (ECF No. 1); Answer (ECF No. 5). In addition to denying the Plaintiff's allegations, the Defendants assert multiple affirmative defenses, including that the Plaintiff's claims are barred by the doctrines of unclean

---

[5]     The federal claim was designated as Count IV of the Complaint, but that appears to be a typographical error. *See* Pl.'s Mot. for Summ. J. 1 n.1 (ECF No. 21).

hands (Fourth Defense), estoppel (Fifth Defense), waiver (Sixth Defense), and laches (Seventh Defense), and that the Plaintiff was an exempt employee under all relevant wage laws and therefore not entitled to overtime pay (Eighth Defense). Answer 4. The parties now have each filed competing motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a rational factfinder could resolve it in favor of either party. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." *Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

The party moving for summary judgment bears the initial burden of showing that no such genuine dispute exists. *Feliciano-Muñoz*, 970 F.3d at 62. Once it does so, "the burden shifts to the nonmoving party . . . to demonstrate that a trier of fact reasonably could find in his favor" with respect to each issue on which he bears the burden of proof. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). Judgment should be entered "if . . . there can be

but one reasonable conclusion" come trial, but "[i]f reasonable minds could differ," judgment should not be entered for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51 (1986). Therefore "summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Morales-Melecio v. United States (Dep't of Health and Hum. Servs.),* 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (citation omitted). I must "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party," *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (citation omitted), and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed," *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir.), *cert. denied sub nom. Merchant v. Mayorkas*, 141 S. Ct. 2858 (2021) (citation omitted).

## DISCUSSION

Before I conduct any analysis on the parties' competing motions for summary judgment, some general principles outlined in the Fair Labor Standards Act ("**FLSA**"), 29 U.S.C. § 201 *et seq.*, and Maine's wage laws are relevant to both motions.[6]

---

[6]     Maine's minimum wage and overtime laws generally agree with their FLSA counterparts, and courts often look to the FLSA when analyzing Maine wage disputes. *See Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 115 (1st Cir. 2006) ("looking first to the federal analogue of the Maine law,

## I.    General Principles

"The FLSA was designed to protect workers 'from the evil of overwork as well as underpay.' " *Giguere v. Port Res. Inc.*, 927 F.3d 43, 50 (1st Cir. 2019) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). Under the FLSA, employers must pay employees a minimum wage for all hours worked. 29 U.S.C. § 206(a). With some exceptions, both the FLSA and Maine's minimum wage and overtime laws mandate that employees be paid at least the then-current minimum wage for any time worked. 29 U.S.C. § 206; 26 M.R.S. § 664.[7] And employers cannot "suffer or permit [an employee] to work" more than forty hours in a workweek without paying the employee overtime at a rate at least one and a half times the employee's regular rate. 29 U.S.C. §§ 203(g), 207(a)(1); 26 M.R.S. § 664(3).

"The basic elements of a FLSA claim are that (1) plaintiff[ ] must be employed by the defendants; (2) the work involved interstate activity; and, most importantly for present purposes, (3) plaintiff[ ] "performed work for which they were under-compensated." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013).

> An employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the

---

the federal Fair Labor Standards Act" in analyzing Maine overtime claim); *Termorshuizen v. Spurwink Servs., Inc.*, 2019 ME 77, ¶ 14, 208 A.3d 415 (applying FLSA regulations to analyze state wage claims given "the lack of any guidance from Maine statutory or case law").

[7]    The applicable hourly minimum wage is either the federal rate or the state or local rate, whichever is higher. *See* 29 U.S.C. § 218(a). Maine's minimum wage rates exceeded the federal rate during the years of Ms. Bradford's employment—$7.50/hour in 2016, $9.00/hour in 2017, $10.00/hour in 2018, and $11.00/hour in 2019—so the Maine minimum wage applies. *See* 26 M.R.S. § 664(1).

> inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 687–88 (1946) *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84, *as recognized in Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27 (2014). It is the employer who is required "to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687; *see* 29 U.S.C. § 211(c). Instead of "penaliz[ing] the employee" for being "unable to prove the precise extent of uncompensated work," if "the employer has failed to keep adequate employment records, it pays for that failure at trial by bearing the lion's share of the burden of proof." *Sec'y of Lab. v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991) (quoting *Anderson,* 328 U.S. at 687).

The FLSA and its accompanying regulations contain carve-outs from these general rules in certain circumstances.[8] "[T]the remedial nature of the [FLSA] requires that its exemptions be 'narrowly construed against the employers seeking to assert them' and 'limited to those establishments plainly and unmistakably within the exemptions' terms and spirit.'" *Cash v. Cycle Craft Co.*, 508 F.3d 680, 683 (1st Cir. 2007) (quoting *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)). At issue here are two often-overlapping strands of the FLSA: whether an employee is entitled

---

[8]     The employer bears the burden of establishing that a particular exception applies. *See Cash v. Cycle Craft Co.*, 508 F.3d 680, 683 (1st Cir. 2007).

to compensation when she is on call for the employer, and how to determine reasonable compensation for an employee who lives on the jobsite.

### A.    Waiting and On-Call Time

Whether time that an employee spends "on call" is compensable time under the FLSA "is a question of fact to be resolved by appropriate findings of the trial court." *Skidmore v. Swift & Co.*, 323 U.S. 134, 136–37 (1944). The "facts may show that the employee was engaged to wait" and is entitled to compensation "or they may show that he waited to be engaged" and is not entitled to pay. *Id.* at 137. The regulations promulgated under the FLSA by the U.S. Department of Labor ("**DOL**") provide guidance on this distinction. An employee is "engaged to wait" or on-duty when "waiting is an integral part of the job." 29 C.F.R. § 785.15. An employee is waiting to be engaged and off-duty when he "is completely relieved from duty" and the periods of relieved time "are long enough to enable him to use the time effectively for his own purposes." 29 C.F.R. § 785.16. The DOL regulations further explain:

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call." An employee who is not required to remain on the employer's premises but is merely required to leave word . . . where he may be reached is not working while on call.

29 C.F.R. § 785.17. An employee is entitled to compensation for on-call time spent "predominantly for the employer's benefit," and the primary "question in on-call cases is whether the employer's restrictions on its employees' time prevent the employees from effectively using the time for personal pursuits." *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 743 (6th Cir. 2000) (citations omitted). If the employee's on-call time is "severely restricted" and the restrictions so onerous that the employee cannot

13

effectively use the time for personal activities, the on-call time is compensable work time. *Id.* at 743–44 (citation omitted).

While there is no "legal formula" that can be used to resolve such fact-variable cases, courts scrutinize "the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Skidmore*, 323 U.S. at 136–37. "Refraining from other activity often is a factor of instant readiness to serve." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944).

## B.   Employee Living on Employer's Premises

"The FLSA's usual rule is that an employer must pay an employee for all time the employee is required to spend at a worksite, even sleep time." *See Giguere*, 927 F.3d at 47 (citing 29 C.F.R. § 785.7). "[U]nder certain circumstances," however, "an employer is not required to pay for all of the time that a worker is on its property." *Saunders v. Getchell Agency Inc.*, No. 1:13-cv-00244-JDL, 2014 WL 12539643, at *4 (D. Me. Dec. 12, 2014). As it did for waiting time, the DOL issued regulations relating to "sleeping time and certain other activities" for live-in employees on the premises:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. *It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.* This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his

14

employer and also to a telephone operator who has the switchboard in her own home.

29 C.F.R. § 785.23 (emphasis added). "The existence of an agreement between the parties may be implied by conduct." *Saunders*, 2014 WL 12539643, at *3 (collecting cases).

The party seeking the benefit of Section 785.23 bears the burden of establishing both that the parties had an agreement in place and that the agreement was "reasonable," taking into account all pertinent facts. *See Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 200 (4th Cir. 2005). If it is reasonable, then the agreement's statement of hours presumptively worked stands and relieves the parties (and the Court) of the need to determine the actual hours worked. *See Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 290 (4th Cir. 2018).[9]

With that legal background in mind, I first address the material disputes of fact that preclude summary judgment for either party on the issue of Ms. Bradford's

---

[9]       As the Fourth Circuit noted in *Garofolo v. Donald B. Heslep Associates., Inc.*, "some courts have described the regulation as a statutory exception." 405 F.3d 194, 199 n.6 (4th Cir. 2005); *see, e.g.*, *Termorshuizen v. Spurwink Servs., Inc.*, 2019 ME 77, ¶ 18, 208 A.3d 415 (noting that Section 785.23 is "often referred to as the 'homeworker exception' "). The *Garofolo* court explained, however, that Section 785.23 is not an exception to an employer's FLSA obligations but instead "simply offers a methodology for calculating how many hours the employees actually worked within the meaning of the FLSA." *Garofolo*, 405 F.3d at 199 n.6 (quoting *Leever v. Carson City*, 360 F.3d 1014, 1018 n.2 (9th Cir. 2004)); *see also Leever*, 360 F.3d at 1019 ("[T]he very purpose of an agreement pursuant to § 785.23 is to approximate the number of . . . hours actually worked."). Section 785.23 cases are usually based on the recognition that, just because an employee resides on the employer's premises, it "does not mean that the employee is necessarily working 24 hours a day," which is why an employer may exclude payment for sleep time if there is a reasonable agreement. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (July 27, 2004) (quoting Wage & Hour Interpretive Bulletin No. 13 (May 3, 1939)). Here, no one suggests that Ms. Bradford should have been compensated for sleep time while on Inn property. For that reason, I agree with the Plaintiff that it is questionable whether Section 785.23 is even applicable here to determine how many of the Inn's open hours were compensable working time for Ms. Bradford. However, the Plaintiff does not provide any authority to say that this same rule does not apply to a less-than-24-hours case like this, so I will proceed to determine whether a reasonable agreement here precludes Ms. Bradford's FLSA claims.

compensation. I next consider whether Mr. Dyke can be personally liable under the FLSA or Maine wage laws. Finally, I turn to the Plaintiff's claim that some of the Defendants' affirmative defenses should be struck.

## II.    Liability under Wage Laws

The parties filed competing motions for summary judgment on whether the compensation paid by NCD—minimum wage for a forty-hour workweek—violated state and federal wage laws. Because there are genuine disputes of material facts, I cannot grant summary judgment for either party.

Viewing the record in the light most favorable to Ms. Bradford, as I must when I assess the Defendants' motion for summary judgment, a reasonable juror could conclude that the Defendants hired Ms. Bradford to be available to assist the Inn's guests between the hours of 9:00 a.m. and 9:00 p.m. seven days a week, and that she was thus "engaged to wait" during those hours. Accordingly, she would be entitled to compensation for eighty-four hours per week. A reasonable factfinder could also conclude that there was no express or implied agreement that Ms. Bradford was expected to work only forty hours per week or that, if there was such an agreement, it was unreasonable given that she was actually required to be on call for eighty-four hours per week. Thus, the Defendants' motion for summary judgment must be denied.

Viewing the record in the light most favorable to the Defendants, however, as I must when I assess the Plaintiff's Motion for Summary Judgment, a reasonable juror could conclude that there was an implied agreement that Ms. Bradford was expected to spend forty or fewer hours per week caring for the Inn and that Ms. Bradford was expected to report to Ms. Caron if she did work more than forty hours

per week. A factfinder, considering the evidence that Ms. Bradford was free to grocery shop, babysit, take her daughter to work, and do other personal errands in the 9:00 a.m. to 9:00 p.m. window,[10] could conclude that when Ms. Bradford was not busy with her Inn chores, she was waiting to engage.[11] Viewing the facts in the light most favorable to the Defendants, the Plaintiff's motion for summary judgment must also be denied.

Accordingly, both the Plaintiff's and the Defendants' motions for summary judgment on the issue of liability for overtime under state and federal law are denied.

## II.   Mr. Dyke's Personal Liability

Turning to the issue of Defendant Dyke's individual liability, however, I find that the Plaintiff has provided sufficient evidence to conclude as a matter of law that Mr. Dyke can be held personally liable as Ms. Bradford's employer under the FLSA. The FLSA defines "employer" broadly as "any person acting directly or indirectly in

---

[10]    In determining the degree to which an employee can engage in personal pursuits while on call, the Ninth Circuit has offered "an illustrative list of factors":

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 936 (9th Cir. 2004) (quoting *Owens v. Loc. No. 169, Ass'n of W. Pulp & Paper Workers,* 971 F.2d 347, 351 (9th Cir. 1992)).

[11]    If Ms. Bradford was waiting to engage, then there would need to be a second round of fact-finding as to how much "active" Inn work she was doing. These facts are also disputed by the parties, with the Defendants applying a "common sense" standard for how long it takes to clean a room, and with the Plaintiff ticking through her to-do list like Martha Stewart. I would note that some cleaning methods take more time than others. *See* Maridel Reyes, *The Ultimate Guide to Household Cleaning: What You Should Be Cleaning When* (Jan. 23, 2021), https://www.marthastewart.com/274764/cleaning-checklists.

the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Although the First Circuit has held that not every corporate officer with authority over payroll matters is subject to personal liability, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Chao v. Hotel Oasis, Inc.,* 493 F.3d 26, 34 (1st Cir. 2007) (citation omitted).

The First Circuit applies an "economic reality" test to this question of personal liability. *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998). Facts relevant to the inquiry are: (1) "the significant ownership interest of the corporate officers; (2) their operational control of significant aspects of the corporation's day to day functions, including compensation of employees; and (3) the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees." *Id.* at 677–78 (footnote omitted).

As to the first element, an ownership stake is "highly probative of an individual's employer status" because "it suggests a high level of dominance over the company's operations" and, relatedly, the individual's "ability to 'cause the corporation to undercompensate employees.' " *Manning*, 725 F.3d at 48 (quoting *Baystate*, 163 F.3d at 678). Here, it is undisputed that Mr. Dyke is the sole member of NCD so he is the only person with any ownership stake in the company. *See* Defs.' SMF ¶ 2.

As to the second element, the First Circuit has found operational control where a corporate officer "had ultimate control over the business's day-to-day operations" and was the person "principally in charge of directing employment practices, such as hiring and firing employees . . . and setting employees' wages and schedules." *Chao,* 493 F.3d at 34. Although he contends that he had little involvement in the day-to-day operations of the Inn, Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("**Defs.' Opp'n**") 12–13 (ECF No. 40), the record here demonstrates that Mr. Dyke ultimately controlled NCD's operations, including hiring Ms. Daruszka, hiring and firing Ms. Bradford, setting the Inn's schedule and the two inn managers' wages and on-premises living arrangements, and talking with both managers about leaving the Inn for personal activities while it was open. *See* Pl.'s SMF ¶¶ 7–8, 45, 56, 59; Defs.' SMF ¶¶ 9, 26, 29, 44, 50, 58–59, 65, 70; Ex. 1 to Pl.'s Reply SMF (ECF No. 41-1). While Mr. Dyke points to Ms. Caron as being more closely involved with the day-to-day operations, the fact is that Ms. Caron was not an employee of the Inn and she was retained by Mr. Dyke to handle payroll. Pl.'s SMF ¶¶ 6, 35; Defs.' SMF ¶ 23.

Because Mr. Dyke solely owned the business and was the corporate officer exercising ultimate control over NCD's employment practices, if a jury finds that NCD violated the FLSA, then Mr. Dyke would have been "instrumental in 'causing' " those violations. *Chao,* 493 F.3d at 34 (citing *Baystate*, 163 F.3d at 678); *see, e.g.*, *id.* (affirming the district court's grant of partial summary judgment holding the president of a hotel company personally liable for its compensation decisions).

Therefore, as a matter of law, Mr. Dyke can be held individually liable under the FLSA for NCD's employment practices.

With respect to the Plaintiff's state law claims, though, I refrain from concluding, as a matter of law, that Mr. Dyke is an employer under Maine's wage and hour laws. The Maine statute does not define the term "employer" as the FLSA does, *see* 26 M.R.S. § 664, and the Maine Supreme Judicial Court has not yet decided whether an individual in Mr. Dyke's position—the sole member of a limited liability company who exercises some degree of control over the company's employment practices—can be found jointly liable under Maine law. For that reason, I follow the lead of other judges in this District and decline to extend personal liability to Defendant Dyke without a clear directive from the Maine Legislature or the Law Court to do so. *See Saunders v. Getchell Agency*, No. 1:13-cv-00244-JAW, 2014 WL 559040, at *7 (D. Me. Feb. 11, 2014) ("[T]his Court declines to extend Maine wage and hour liability to corporate officers and owners in the absence of a clearer legislative directive to do so."); *Affo v. Granite Bay Care, Inc.*, No. 2:11-cv-482-DBH, 2013 WL 2383627, at *7 (D. Me. May 30, 2013) ("Given both the Maine legislature's silence on the definition of 'employer' and the reluctance of Maine courts to hold shareholders individually liable, I decline to extend liability under Maine's wage and hour law to individual shareholders and officers.").[12]

---

[12]     This question may ultimately need to be certified to the Law Court as this litigation progresses. *See Affo v. Granite Bay Care, Inc.*, No. 2:11-cv-482-DBH, 2013 WL 2383627, at *7 n.15 (D. Me. May 30, 2013) (recognizing "this is a close question . . . so that the issue may ultimately need to be resolved by certification to the Law Court"). But that is for another day. Similarly, the Plaintiff's argument that Mr. Dyke can be held liable under a corporate veil-piercing theory must also wait because the summary judgment record is devoid of any evidence that would support such a finding.

### III.   The Affirmative Defenses

Last, I turn to the Plaintiff's request for judgment as a matter of law on the Defendants' asserted affirmative defenses. The Plaintiff maintains that: the Defendants are not entitled to an unclean hands defense where they had reason to know the Plaintiff worked but did not report overtime hours (Fourth Defense); the affirmative defenses of estoppel (Fifth Defense), waiver (Sixth Defense), and laches (Seventh Defense) are not available under the FLSA; and Ms. Bradford did not qualify as an exempt employee (Eighth Defense). Pl.'s Mot. 19–20. The Defendants concede that the affirmative defenses of waiver, laches, and exemption are not available under the FLSA and stipulate to these defenses being stricken. Defs.' Opp'n 14 n.6. But the Defendants contend that the affirmative defenses of unclean hands and estoppel have been recognized under the FLSA, and they maintain that there is sufficient evidence in the record to support their unclean hands and estoppel defenses. Defs.' Opp'n 13–15.

#### 1.   Unclean Hands

The Defendants' only argument regarding the propriety of their unclean hands defense is that it has "been recognized as a valid FLSA defense." Defs.' Opp'n 14 (citing *McGlothan v. Walmart Stores, Inc.,* No. 6:06–CV–94–ORL–28JGG, 2006 WL 1679592, at *3 (M.D. Fla. June 14, 2006)). "[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted). Because the Defendants' cursory treatment of their unclean hands defense fails to meet this mark, they forfeit this argument. *See id.* ("[I]ssues adverted to in a perfunctory

21

manner, unaccompanied by some effort at developed argumentation, are deemed waived."). I therefore grant the Plaintiff's motion as to the Defendants' unclean hands defense and strike the affirmative defense of unclean hands.

### 2.    Estoppel

Generally, "[e]quitable estoppel is a judicially-devised doctrine which precludes a party to a lawsuit, because of some improper conduct on that party's part, from asserting a claim or a defense, regardless of its substantive validity." *Phelps v. Fed. Emergency Mgmt. Agency*, 785 F.2d 13, 16 (1st Cir. 1986). The doctrine can be invoked "when 'one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it' acts to his or her detriment." *Id.* (quoting the Restatement (Second) of Torts § 894(1) (1977)). The party claiming the estoppel must show that the reliance on the misrepresentation worsened the party's position, "and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,* 467 U.S. 51, 59 (1984)).

Here, the Defendants argue that the defense is valid in FLSA actions where the employee "affirmatively misleads the employer regarding the number of hours of worked and the employer had no knowledge of the employee's actual hours." Defs.' Opp'n 14 (quoting *McGlothan*, 2006 WL 1679592, at *2; and then citing *White v. Spurwink Servs., Inc.*, No. 2:12-cv-117-GZS, 2012 WL 3138865 (D. Me. July 31, 2012)). They point to factual disputes over Ms. Bradford's "actions in concealing the

alleged truth of [her] hours" and the Defendants' knowledge of her work hours. Defs.' Opp'n 14. What the Defendants fail to appreciate, however, is the undisputed fact that the Defendants never gave Ms. Bradford hours-recording instructions or anything with which to track her hours, resulting in no record whatsoever of Ms. Bradford's work hours. *See* Pl.'s SMF ¶¶ 39–42.

The FLSA is clear that ensuring compliance with the statute's overtime requirements is the employer's obligation "and it is absolute." *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959). "He cannot discharge it by attempting to transfer his statutory burdens of accurate record keeping, 29 U.S.C.A. 211(c), and of appropriate payment, to the employee." *Id.*; *see also id.* (rejecting employer's argument that the plaintiff was precluded by estoppel from challenging his own time sheets and holding that such an argument is "inconsistent with both the language and the policy of the Fair Labor Standards Act"). For this reason, many federal courts have long rejected equitable estoppel as an affirmative defense to an FLSA action, except in cases where employees were required by employer policy to record overtime hours and failed to do so. *See, e.g., Burry v. Nat'l Trailer Convoy, Inc.*, 338 F.2d 422, 426–27 (6th Cir. 1964); *Handler v. Thrasher,* 191 F.2d 120, 123 (10th Cir. 1951).[13]

---

[13]     I recognize that federal courts in Florida have permitted the asserted estoppel defense to survive a motion to strike. *See McGlothan v. Walmart Stores, Inc.,* No. 6:06–CV–94–ORL–28JGG, 2006 WL 1679592 (M.D. Fla. June 14, 2006). But those courts appear to be outliers on this issue and were constrained by "binding precedent in [the Fifth] Circuit . . . that the affirmative defense of estoppel is available in response to an FLSA claim where the employee affirmatively misleads the employer regarding the number of hours worked and the employer had no knowledge of the employee's actual hours." *Id.* at *2 (citing *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972)). The First Circuit is silent on this issue, so I face no such constraint. Even if I were to follow the Fifth Circuit's lead, there is no evidence in the record that Ms. Bradford "affirmatively" misled the Defendants about her hours, so the defense of estoppel still would not be available to the Defendants in this case. *Cf. White v. Spurwink Servs., Inc.*, No. 2:12-cv-117-GZS, 2012 WL 3138865, at *1 (D. Me.

Here, the record contains no evidence that Ms. Bradford deliberately failed to record her overtime or intentionally falsified her time records. The Defendants never required such records from her. And there is no evidence that she ever affirmatively misrepresented her working hours to the Defendants.[14] She was silent. That is not enough to support an estoppel defense in this FLSA case. *See, e.g.*, *Thurman v. Stavaru Acad.*, No. 1:16-cv-10889, 2019 WL 951243, at *6 (N.D. Ill. Feb. 26, 2019) (finding that "the exception to the general rule" that estoppel is generally not applicable in a FLSA action did not apply where defendants did not argue or plead that the plaintiff affirmatively misled them but only claimed that she "remained silent"); *Perrin v. Papa John's Int'l, Inc.*, 114 F. Supp. 3d 707, 726 (E.D. Mo. 2015) (striking estoppel defense where defendants had not demonstrated that any exceptions apply and argued only that plaintiffs "failed to report" but "there [wa]s no evidence of a policy which required them to do so, and [d]efendants . . . admitted that they did not track employees' actual expenses anyway").

Accordingly, I agree with the Plaintiff that the affirmative defense of equitable estoppel should be stricken.[15] The Plaintiff's motion for summary judgment on the Defendants' estoppel defense is granted.

---

July 31, 2012) (permitting the defendants to assert a "limited" estoppel defense against plaintiffs claiming to be "entitled to be paid for more hours *than they themselves reported on their time sheets*") (emphasis added).

[14]     There is one instance in the record where Ms. Bradford was instructed by email after a "good week" to let Ms. Caron know if she had worked more than forty hours. Pl.'s SMF ¶¶ 48–49. Even drawing all inferences for the Defendants, this does not satisfy the FLSA employer-recordkeeping obligations, and the fact that Ms. Bradford failed to report her overtime in response to that one email does not justify permitting an estoppel defense here.

[15]     That is not to say that the Defendants cannot assert at trial that they had no actual or constructive knowledge of Ms. Bradford's overtime work as that knowledge relates to the elements of

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendants' motion for summary judgment, and **GRANTS IN PART** the Plaintiff's motion. The Plaintiff's motion for summary judgment is **GRANTED** with respect to the Defendants' asserted affirmative defenses; the Defendants' Fourth Defense, Fifth Defense, Sixth Defense, Seventh Defense, and Eighth Defense are thus stricken. The Plaintiff's motion is also **GRANTED** as to Defendant Dyke's individual liability under the FLSA. The remainder of the Plaintiff's motion for summary judgment is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 16th day of May, 2022.

---

the Plaintiff's claims that the Defendants violated the FLSA. *See Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 44 (1st Cir. 2013) ("[A]n employer's actual or imputed knowledge is a necessary condition to finding the employer suffers or permits that work." (citation omitted)).